Good morning, Your Honors. May it please the Court, my name is Joseph Scott. I represent Defendant Robert Flipping. At this time, I would like to reserve one minute rebuttal time. Your Honors, due to the fact that this was two appeals consolidated into one appeal, the Court has split the time that the appellants have in oral argument. And respectfully, Mr. Riso and I have divided the arguments to address before the Court, if that pleases the Court. I would like to address the issues of jurisdiction in the 14th Amendment, and Mr. Riso, Counsel for Arthur Snellbaker, will address the First Amendment and the CEPA cause of action. Very I mean, you don't both get rebuttals, okay? You can do that? We don't usually have people popping up. That's fine. We weren't aware of that. Did you each plan to have a one-minute rebuttal? I had planned to have a one-minute rebuttal. I can't speak for Mr. Riso. If it pleases the Court, I won't ask for a rebuttal. Okay, thanks. Thank you, Your Honor. Very The issue of the lack of jurisdiction was addressed before a panel of the Third Circuit by way of a motion to dismiss. We're not bound by that. Let me just clarify that. In fact, our IOPs say that a motion panel is not supposed to deny a motion to dismiss on jurisdictional grounds. It can only grant it or send it to the merits panel. I haven't talked to them, but it was just an error. In any event, we're not, I tell you right now, we're not bound by that. We can make our own decision. Okay, Your Honor. Briefly, let me address the issue of jurisdiction. Ordinarily, appellate courts do not have jurisdiction to review interlocutory orders. We are here on a denial of summary judgment under the Collateral Order Doctrine. And it's the position of the defendants that the Collateral Order Doctrine applies here because the denial of summary judgment on the First and Fourteenth Amendment turned on an issue of law. It's the defendants' positions that the issue is a matter of law and not fact, as argued by the plaintiff. Well, with respect to the due process piece of that, the district court was real explicit in saying, hey, there's not enough of a record here yet to know who the decision maker was. Atlantic City says the mayor's office is. Mr. Snowbaker says that's the chief. He is. That's a question of fact that hasn't been resolved. It's material. And I got to say, seemed material to me. What's what's immaterial about that? Well, Your Honor, I would submit that as to defendant flipping, it is material, but there's no fact indicating that he was the decision maker. As Your Honor correctly pointed out, the city said it was the decision maker through the appointing authority. And Snowbaker said he was. But that does not mean there's flipping or not. The question is the process that he was due in this circumstance. And I guess I feel like you've presented me with the with the non sequitur. I'm not sure how Mr. Flipping's saying I'm not the decision maker answers the question of who is. The question is, who is the decision maker saying it's not me? Doesn't answer the question, does it? Well, Your Honor, I believe that does. But maybe I can further address it this way. I believe that the submission of counsel for Mr. Snowbaker, Chief Snowbaker, was just partly incorrect when he said that the chief had the final decision making authority other than the statement in a brief. To that effect, there is nothing before the court that we have now. We have another point about a factual assertion, but we still have a factual assertion. You're saying you agree with the city. That's great. That's correct, Your Honor. But there's still a factual issue open, isn't there? I'm constrained to agree that there is a factual issue. It just doesn't apply to my client. Well, Mr. Scott, it seems to me after reading, especially after reading your reply brief, that what you're saying is that there was no violation of Riley's constitutional right because he didn't use the administrative process available to him as a remedy, right? That's correct, Your Honor. Okay. Now, that may be a perfectly valid defense, but it doesn't implicate qualified immunity because it's something, it's not something we can deal with in the interlocutory appeal. You're just saying it's wrong. The fact that it's wrong, you may be right that it was wrong, but that's not, you're only here on an interlocutory appeal because a denial of qualified immunity is appealable at this time, and that's a merits issue, really, and we can't deal with a merits issue now. Your Honor, I believe it goes to the first part of the qualified immunity analysis, which is assuming the fact's alleged, whether there was a constitutional right that would have been violated. Well, but on your point that he didn't use the administrative process, that doesn't go into, how does that go into the constitutional right? Well, Your Honor, under the second part of the 14th Amendment analysis, the plaintiff has to prove that the procedures available to him did not provide him with due process. How can the plaintiff say that when the appointing authority or whoever the court wants to assume the decision never rendered a final decision? It's assuming that there was a final decision made in this case, and there clearly was not. He simply did not avail himself of the process that he was entitled to take advantage of. So you're entitled to win, but maybe not at this stage. And doesn't your question assume that there would be no remedy? Well, let me ask it this way. I apologize. Let me try this again. Assume for the sake of discussion that your opponent's correct that the wrong decision weighed in here and rendered a final decision, and he chose not to appeal and take it up. Does the fact that he didn't take steps two, three, or four mean that step one, being incorrect, was not a violation of due process rights? Well, assuming those facts, I think he had a post deprivation remedy of appealing the decision. But without going through the appeal process, he weighed that right. He can't say we denied him that right. Nobody blocked him from letting the appointing authority, whoever it was, make a decision. He simply chose to retire. He elected not to let it get that far. But then going to Judge Slocar's point, that's a merits argument, right? Not a qualified immunity argument? Well, Your Honor, I submit it goes to the First Amendment of whether there was a violation at all. Yeah, but that's a merits issue. I thought we were talking about the due process, not the First Amendment. So if I'm mistaken, I apologize. But I felt the ground shift on the mill a bit, I think the way Judge Slocar did, which is now we're not talking about whether there's qualified immunity. Now we're talking about whether, as on the merits, you're entitled to win because he didn't fully exhaust all the administrative remedies available to him. Am I misunderstanding you? Your Honor, I think it's a very specific issue. I agree it's close, but I believe that this issue falls under the first prong of qualified immunity. Assuming the facts as we have them, that there was not a final decision made, is there or was there a constitutional right that would have been violated? And the answer is no, because he didn't avail himself of that right. I think we understand it. Thank you. I have a question on jurisdiction. And this goes to the retaliation claim. Do your clients admit they retaliated? Do I agree that he retaliated? No, no. Do your clients admit that they retaliated? I'm not... No, Your Honor, I don't believe they do. If they deny they retaliated, isn't there a genuine issue of fact and dispute? On the SEPA cause of action? Yes. And I withdrew the SEPA argument. No, I'm talking about the First Amendment. Maybe I'm not following. I thought we were talking about SEPA, Your Honor. If there's a jurisdiction, if your question is why are we here on jurisdiction on the First Amendment, it's because of Garcetti. Garcetti has finally established that public officials speaking pursuant to their public duties is not a constitutional violation. The admission, if I may, I noted when I reviewed the materials that in page five of my reply brief, I quoted what I'm about to quote again. And I did not reference it. It's to the appendix 133. This case is different than other cases where it is disputed as to why the plaintiff did what he did. Mr. Riley, Sergeant Riley admitted why he did what he did. And the question that was asked him in his deposition, did you tell Flipping in that conversation, in the detective bureau, I did what I did because it was my job. I was ordered to do it. I'm doing my job. I did my job. And the answer was that was the, you know, that was the context of the conversation. Question, that is a fair summation of what you transmitted to Flipping, correct? Yes. So he's admitted that what he was doing in the investigation and in his subsequent testimony was pursuant to an order, pursuant to an assignment. Excuse me, I thought that your co-counsel was going to take up the Garcetti and first amendment. He is, Your Honor. Okay, because if not, I have some questions on that too. So I won't ask you. Did you get an answer to your question? I'm not sure. I apologize if I don't understand you. I thought it was on jurisdictional grounds on the first amendment. Okay, we'll hear from your co-counsel on the My name is Eric Riso. I represent former Chief Arthur Snell Baker in this matter and pursuant to the statements made by the beginning, I won't reserve any time for rebuttal. But I do want to ask you a question. Do you read Garcetti to say that if a police officer is called to testify in a trial and because he is a police officer and he was on the vice squad and he investigated certain things and he answers the questions that he could be fired? I'm not implicate his superior officers in a vice ring. He can be fired and he can't say that I, my first amendment, you know, I have to answer the questions and you can't fire me for that. I do so long as that you do, you do think that's what he says with this caveat. So long as his held and said is the controlling factor. Now, admittedly, the Supreme Court in Garcetti did not have to deal with the issue that presents itself here. We're talking about testimony, internal memorandum. I went, you know, and that caused some problem within the department. I'm amazed. Haven't other courts, haven't other circuits said it doesn't apply to testimony in court? There are, there is case all that says that testimony in court is protected by the first amendment. Most of that case all is pre Garcetti, but there are, this circuit has not addressed at least based on the research that we've conducted, any postcard setting. This is the third case that we have today in which we're going to have to make law. I just want to point out just louder again, though, to emphasize the point. And admittedly, the issue of trial testimony was not before the Supreme Court in Garcetti, but the majority did state that the controlling factor in the case was the plaintiff's that the plaintiff's expressions were made pursuant to his duties in that case as calendar deputy. And they went on to say, and I'm quoting, we hold that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for first amendment purposes. And the constitution does not insulate their communications from employer discipline with no strings attached. Significantly in this case, it is undisputed. Even the district court recognized that footnote 18, that the testimony that Riley gave was pursuant to his official duties. Well, first of all, the district court was dealing before Garcetti. Absolutely. And uh, second of all, it was a state prosecution of Munez rather than a city. I mean, the Atlantic city, city of Atlantic city didn't prosecute, uh, Munez. Wasn't that the state? Am I, am I in the wrong case? No, it's Atlantic city. That's right. Uh, Munez was being tried. By the way, whatever happened to Munez, I never could figure it out. Was he convicted? I don't know the answer to that there was a joint investigation, but he was called as a witness in a state case against Munez, right? He was, but he admitted as Mr. Scott pointed out earlier in his deposition that he was involved in the investigation and testified because he was doing his job. It was part of his job and that fact is not in dispute in this case. Doesn't, does Garcetti speak to the, the rights or remedies that people should look to who in the course of doing their job are done dirty by their superiors? Because assume for the sake of discussion, I'm sure you'd say, no, that didn't happen here. But you know, the hypothetical posed by Judge Slobider is, uh, that these people had it in for Mr. Riley for doing nothing more than his job. And that in fact, Mr. Flipping was implicated in earlier wrongdoing. And what kind of a, what kind of a system do we have when a police officer doing his job can't keep his job because the superior is corrupt? That's sort of the plaintiff's pitch here. What's the, what's the, what's the response when the assertion from your client and Mr. Flipping is can't get us for that qualified immunity? The response is whistleblower, the whistleblower remedies in this case, because we're dealing with New Jersey law, SIPA. That's correct. If I may, because the court seems to be with all the respects, struggling a bit about this jurisdictional question and whether or not we're getting into the merits. I think that that's what the circuit courts are now required to do since this amendment, frankly, I have the same problem that was expressed here with respect to the 14th. I think either way under Scott B. Harris, it's that the circuits have now been, the circuit courts have now been directed by the Supreme Court to address the constitutional claim as part of the first step of the two-prong analysis. So that's why we get to the merits on not only the first amendment claim, but also the due process claim as well. I would submit that if this circuit or this panel doesn't agree that Garcetti controls for purposes of the first amendment analysis, there are still three other questions though that the district court committed error on when it determined that the defendants had violated or that the facts had showed that the defendants had violated his first amendment rights. The district court concluded that there were issues of fact that precluded qualified immunity. That's what the, I think that's what the district court concluded. The problem is, is that, and this is why it is the defendant's position that this matters properly before the courts, is that the analysis of whether those facts identified by the court are sufficient to establish a violation was done erroneously. We're not asking this court to determine what the set of facts can prove. What we're suggesting to this court is, what we're arguing is that the set of facts identified with the district court are not sufficient to establish the violation. Why don't you tell us then in your own words, what were the issues of fact that the district court thought precluded qualified immunity? It was mentioned earlier during the argument that presumably Flipping and Snowmaker had it out. That's the allegation that they had it out for Riley because of his involvement in the record. However, clearly establishes, and I think this judge Alicante may go to the question that you asked Mr. Scott, clearly, clearly establishes that there were no facts to support the claim. I remember we were before the district court on summary judgment. It was time for plaintiff to put his best foot forward. There were no facts to establish that defendant, certainly Snowmaker, was substantially motivated by Riley's investigation and involvement and trial testimony. Well, wait, aren't we required to draw every reasonable inference in favor of the plaintiff? Because there's, well, I'm sorry, are you disagreeing? No, I was going to say no doubt about it. Yes, absolutely. Then isn't, I mean, the district court was very careful to go through and talk about circumstances where Mr. Flipping's involvement with Mr. Riley could be understood to be motivated by animosity associated with an earlier investigation of Mr. Flipping and that Mr. Snowmaker, by further inference, was trying to please Mr. Flipping and that that's why the two of them, in the face of a hearing officer's express statement that this is not something that a four-day suspension got, and now I'm assuming the persona of Mr. Riley, that yes. The motion and 90 days and from sergeant to police officer. Right. Retire now or you're losing it all, felon. You know, that's the inference that the district court thought was fair from the evidence. Why is the district court wrong that there was evidence from which you could infer that? How do you get to no evidence? I guess that's what I'm asking. Excuse me? How do you get to there's no evidence? Can I piggyback on that? You certainly may. What about Friel? Friel, another police officer said that Flipping told him that he'd get back at Riley when he was in a position to do so. It's just a little piggyback. I think I understand the question and this is where significantly, and this is why this case is interesting and separate appeals. This is where the interest of Snell Baker and Flipping do and in fact must diverge. I mean, I know that Mr. Scott does not believe that his client violated any of the plaintiff's constitutional rights, but the record was devoid of any evidence that Snell Baker had any animosity and the mere fact in the district court made this statement, and I was surprised that Judge Irena said it, that Snell Baker knew of the Munoz investigation and trial and seemed to say, now my words, ipso facto, it must have been a motivating factor. Well, that's not the issue. There has to be some facts that the plaintiff put forth to create the factual dispute. Who does Mr. Snell Baker report to? The director of public safety? Yes. Okay, so isn't a fair inference from this record that your client's boss, Mr. Flipping, who the record does have evidence. I mean, I hear you in effect acknowledging there's evidence in there from which one could infer that Mr. Flipping had a very bad motive. Isn't there evidence in the record from which one could infer that Mr. Snell Baker, wanting to please his boss, was prepared to do what his boss, Mr. Flipping, wanted done? No. So that's not an inference that one could draw. There's no evidence from which that inference could be drawn. There's conjecture and speculation, perhaps, but that's not enough. There is some evidence. I guess one could say that there's some evidence. The report from Flowers who did the question was to which of the two of them, well, there's some evidence the two of them discussed, and that they decided that it would go first to Flipping, and Flipping would write a letter to Snell Baker, and Snell Baker would then proceed from there. You may disagree with the facts, but if there's a question of fact, that precludes qualified immunity at this stage, and certainly from Riley's perspective and what he put forward, one could find some joint discussion with respect to the extent of sanction that should be placed on Riley. This is not to say Riley will win. It's only to say, well, was the district court wrong in saying there are questions of fact, I can't decide qualified, you know, you can't have qualified immunity right now? If I can quickly, I know my time's about up. Yeah, sure, no, that's okay. First, remember, qualified immunity, though, is immunity from suit, not just the defense at the time of trial. So that's why it's important that we deal with this issue now. But the cases, our cases are very clear that if there's a question, and everyone's cases, but I know ours, there's a question of fact, you can't get qualified immunity. Absolutely. The report from Flower, two things about that. One, it wasn't sent to Snowbaker or Flipping. It was sent to the lawyers for the parties. It was sent to Arthur Murray, who represented Robert Riley, and it was sent to Adam Lever, who represented the city's interests at the time. The Flower report begins, at least on my appendix. We've read it. So let's be clear, it wasn't sent to Snowbaker. Number two, when you look at the Flower report, it's based solely on Riley's sexual harassment and creation of a hostile work environment toward a subordinate female officer. And when you read Snowbaker's memo to Flipping, there's no inference, respectfully, that can be drawn that he was motivated in any way, shape, or form by Riley's involvement in the Munoz case. To the contrary, it's clear from Snowbaker's memo to Flipping, when you look at the Flower report, that his sole motivating factor, and this also, I guess, would translate into the next argument on the First Amendment. If you think there's a fact question on substantial motivating factor, in a dual motives case, it's clear he would have made the same decision anyway. And there's nothing in the record to establish anything to the contrary. It's clear that he would have made the same decision anyway. That's an interesting proposition. How is that clear from the record? And, you know, I would have thought that had the court been asked that question below, or that argument had been made below, that there might have been a whole series of fact issues that would surround that. Like, is it typical to suspend somebody for three months, demote them, and threaten them with other sanctions if they don't resign in the face of a single event? Which, as I understand you saying, is all that Mr. Snowbaker, Chief Snowbaker, was looking at. I mean, we can take from the record that Director of Safety, Mr. Flipping, was looking at other things beyond that. That's something that one could infer from the record. But your statements here today are that inappropriate off-color remark of some sort to a female officer, and that on the basis of that, an officer with many years in the force was told, in effect, resign now or lose your rights. Now, I would have guessed that if that pitch had been made to the district court, the district court might say something like, really, is this the common level of response to an infraction, serious though it may be, of this sort? Maybe we need to get into that. But you're telling me that this record is clear that the decision would have been the same anyway. And that's a bit of a surprise to me, because when I read the record, that's not clear to me, and I might be missing something. Why is it that it's clear? To me, it's clear because on summary judgment, when you refer the district court or the trial court, whether it's state court or federal court, the plaintiff has to do more than rest upon the mere allegations or denials. The plaintiff submitted nothing to the district court to show that Snowbreaker was motivated or that he would have made, they would not have made the same decision anyway. The record was completely devoid of that evidence. Judge, you're right. If the plaintiff had come forth with some facts from which an inference could be drawn, that perhaps the Munoz involvement did play a role in this case. Well, we're going to hear from the plaintiff now, because your red light is on. And I think we understand your position. Thank you. Mr. Corrado. Thank you, Your Honor. May it please the court. My name is Frank Corrado. I represent Robert Riley. He's the plaintiff in this matter. Munoz was acquitted, Your Honor. He was. Yes, he was. He was represented by Mr. Jacobs, Eddie Jacobs. Is that supposed to mean something to us? He's a well-known criminal defense lawyer in Atlantic City. Oh, I'm sorry. I'm sorry. It's our jurisdiction, but not within my knowledge. The court's jurisdiction in this case, I think, extends only to the issue of qualified immunity. And insofar as that's concerned, only to issues of law that are raised by the denial of a defense. We'll respond to you with Mr. Scott's statement, which Mr. Russo just, I hope I'm saying your name right, sorry, reiterated, which is, hey, you judges, you've got to get into this merits piece of it now, because that's the first prong of the Scott v. Harris thing. There's constitutional right, and then, and in order to answer that question, you have to get into it. I don't understand the court's precedents, the Supreme Court's precedents, or this court's precedents to actually say that. Although I do concede that the first prong of the qualified immunity analysis could raise questions of law that I think a court like this court could review on a denial. For example, the question of whether Garcetti insulates trial testimony by a police officer from a First Amendment challenge, or excuse me, retaliation for trial testimony from a First Amendment challenge, that could be a question of law, I think, that this court might want to address on a denial of qualified immunity. But an issue, for example, the 14th Amendment issue that's raised by this case, the procedural due process issue, in which there is clearly a question of fact about whether a decision was made, a final decision was made, and who made it, that issue can be reviewed. When you say, I'm sorry, when you say a final decision clearly was made, your opponent says a final decision wasn't made, Mr. Riley resigned, and that is enough to sink his appeal and his assertion that he's got a 14th Amendment due process claim here. What's your response to that? Well, there are questions of fact involved in that decision, in that determination, that deprive this court, I think, at this stage, of being able to hear. Are you disputing that he resigned? He did resign. Okay. Their point, if you'd stick with me, on the legal point that I think Mr. Scott is making is that fact, which isn't disputed, is all by itself enough to sink the constitutional claim, because if he resigned, that's it. There was no final decision made, and therefore, there can be no complaint that there was a violation of due process. That's the point I'm trying to get you to respond to. Okay. The issue then, he's asking the court to hold that under no certain failure to utilize post-deprivation process, in all circumstances, is, as a matter of law, ends a due process violation, insulates the plaintiff from making a due process claim. That's not the law, and in this case, there is a serious factual question about whether the defendants hijacked this process, this term, this disciplinary process against Riley, and in essence, made it impossible for him not to resign. Deprived him of the ability to meaningfully invoke his post-deprivation remedies. That's the factual issue that precludes... Can I get you back to the question I was going to ask at the beginning, which was jurisdictional, and that is, if I understand what you're saying, you agree that we have jurisdiction over the denial of qualified immunity on the First Amendment ground, because it presents the question of law as to the scope of Garcetti, the Supreme Court's decision after the disreport, and that we cannot, it's appropriate for us to decide, we have jurisdiction to decide whether Garcetti is a defense as the defendant's claim to the retaliation claim and violation of the First Amendment. We have jurisdiction, we can decide that, you say, right? I believe to the extent that a question of law is involved here. That's a question of law? The court, yes. Okay. Well, let me say this, Judge. I think that when you're talking about the First Amendment activity of Mr. Riley, you have to make a distinction between his trial testimony and what I'll call his investigatory speech. Let's talk about his trial. Right now, I'm talking about his trial. I'm just asking. They say, Mr. Riley says, they retaliated against me because I testified in the vice trial against Mr. Nunez that he was a police officer, he acted as a pimp for a prostitute, a prostitute testified. I got all that information when I was in the vice trial. I testified to that. Flipping was somehow involved, although he was in charge, but he was angry. Nunez was one of his boys. That's what he's claiming. That's correct. Nunez was one of his boys, and he says, they called me to testify, and I testified, and they had it in for me, at least Flipping had it in for me. He made life so miserable, I couldn't live on the salary of a private, and my retirement paid, my pension was at issue, so I retired, but I want to sue under 1980. That's a question of law as to what, and they say, Garcetti protects us. And you say Garcetti doesn't, and that's a question of law, and we can decide that now. I agree with that. Okay, and then I think, so then you also say, well, that's not true with respect to the 14th amendment due process claim, because that's really a, there's a factual issue, that's really a merits issue, whether he could or should have gone through the process, the administrative process, they, I think you said hijacked that process, that's a question of fact, and therefore, the district court was correct in saying no qualified immunity, because it's a question, there are factual issues, and therefore, we don't have jurisdiction. We don't have jurisdiction. I'm not saying that there isn't qualified immunity. No, I understand, but. I'm also saying, if this court is prepared. Well, I just want to make sure that the, so that you agree, they're different, in other words, there's a different analysis jurisdictionally between the first amendment and the 14th amendment. That is correct, I am saying that. All right, that's all I wanted to know. I'm sorry, did I cut off somebody else's question? No. No, okay, go ahead, I cut off your answer. I don't have anything else to say, except, unless. So, I have a question for you, I do indeed. I would like you to respond to Mr. Russo's point that there's a failure of proof on your client's part, but with respect to the assertion that Mr. Snellbaker had. With respect to Mr. Snellbaker. Right, that there was no evidence from which one could reasonably infer that he was motivated by anything other than doing his job. That simply isn't so, there is the following evidence in the record. There is testimony by patrolman Friel that Mr. Snellbaker, as well as Mr. Flipping, had an antipathy, a long-standing antipathy to Mr. Riley, because of Mr. Riley's association with a man named James Denoto, who was Snellbaker's great enemy in the Atlantic City Police Department. Former police chief. A former police chief, that is correct. And Riley's mentor. Riley's mentor in the department, that's correct. We do read the creeds. Sir, I'm not here to dispute that, your honor. There is evidence that Mr. Snellbaker saw Flowers' memorandum and expressed, I believe, consternation is the word in the record about it. Went to Flipping and they had a discussion about, you know, how can this be? There is, and Snellbaker's recommendations, along with Flipping's, is all out of proportion to what a progressive discipline would have shown. What's your record for what a progressive discipline would have shown? Because that's effectively the question I was trying to put to Mr. Russo, and he says there's no evidence that this was anything other than the kind of response that would have been made. There's nothing in the record that I know of that shows what a typical response to this would be. I don't think that that's in the record at all. What about the hearing officer's statement of what the appropriate remedy is? Well, there's that, but that was, I can't say that that is typical of what other incidents like this generated by way of discipline in the Atlantic City Police Department. There's nothing in the record one way or the other. Certainly, Riley's prior disciplinary history didn't warrant, is consistent with the recommendation that Mr. Flower made. So there, well, I'm not sure I understand what you're saying. Are you telling me that there is something in the record after all, Mr. Corrado, and that thing that's in the record is Riley's own disciplinary history? Is that something from which you can infer or understand what discipline typically would be? No, I'm not saying that. If I implied that, I misspoke. I apologize. Well, the disciplinary history happened 15 years before. Then he had 15 years of good reports. That's my point, is that he had an exemplary, at least for the last 15 years, record as a police officer. There were some suspensions early on. Not as many as appeared on the record that Mr. Flipping used to generate what I consider his retaliatory disciplinary finding. In addition to that, there is something, there is a deposition of Mr. Snellbaker in the record, I believe around 338, in which he testifies about making a sexist remark about Mr. Riley's wife. Or, excuse me, laughing off a sexist remark about Mr. Riley's wife that was pretty much of the same magnitude as what he then wanted to cashier Mr. Riley for. There is evidence, and there is the connection between Riley and, excuse me, between Flipping and Snellbaker that makes Snellbaker answerable to Flipping. These are all facts from which a reasonable jury could infer that Snellbaker participated with Flipping in retaliatory action against my client. Do we have jurisdiction to decide whether there's any evidence that connects Snellbaker to what happened? I don't believe you do, Your Honor. Well, you have to show that there was a constitutional deprivation of a constitutional right. I'm not sure. Riley's constitutional right. Well, here's my question that plays on what Judge Slover says. If I understood Mr. Russo's argument, I think his assertion is there's no deprivation of a due process right here. Because there's no indication that Mr. Riley would have been treated any differently even if Mr. Snellbaker had been deep in the Munoz circumstances. But this is the discipline appropriate just to the sexual harassment. It wasn't. Therefore, even if there were a dual motive, even if there were dual motives, it's what he would have gotten anyway. No deprivation of constitutional right and therefore qualified. I mean, I think I've followed it. Maybe I haven't. But I'm not sure that that's his argument. But even if it were, it still seems to me that that argument is fraught with factual issues that I could dispute factually. There is some evidence in the record of an expert's report, my expert's report, in which he indicates it's a former New York City police chief who indicates that the discipline imposed was disproportionate for the offense. Even though it's not, it doesn't compare to other Atlantic City incidents. I'm not sure that I had to do that in order to establish a due process violation. I think I just have to raise. What's your expert's name? I beg your pardon? What was your expert's name? Raymond King. King. King, K-I-M-G. I just want the record to show that there's no claim of sexual harassment. There's a distinction. There's no claim of sexual harassment. The claim that I understood was that he made remarks, sexist remarks, in the presence of the woman police officer and others, and that that translates into at most a hostile environment as distinguished from sexual harassment. Those were the disciplinary, that was the matter on which Mr. Riley was brought up on disciplinary charges, yes. It was a hostile workplace situation. Do you have any questions? Thank you, Mr. Groton. Mr. Friel's lawyer gets one minute. Mr. Flipping's lawyer. Your Honor, if I may, I think with all due respect, I think the court is troubled over an issue which pertains to Mr. Snellbaker, and if the court permits, I would defer my time. Sure, that's fine. We'll hear anybody for a minute, two minutes. Turn it to the hot seat. Mr. Rizzo. Not too hot. Judge Slover, I'm looking at hearing Officer Flowers' report. My recollection was, and I'm skimming through, was that he did in fact conclude that Riley had created a hostile work environment, and that his conduct didn't did amount to sexual harassment. It's just the point that Flowers... It doesn't make any difference, though. He did say that he doesn't deserve to be demoted. He doesn't deserve to be suspended for more than four days, and that Snelling and then Flipping, first Flipping and then Snelling, recommended substantially increased sanctions based on a personnel report of disciplinary actions that turns out not to be official and incorrect because it had something like 39 days of suspension that never were given. Is that a correct statement of the record? That is. Okay. And I think... So whether it's sexual harassment, I was just really tweaking my colleague, Judge Jordan, but it doesn't really matter in the end result. The fact is that Riley claims, whether correctly or incorrectly, that he was forced to retire based on the animus that precipitated these recommendations of substantially more severe punishment than sanctions than Flowers recommended. That's the fact, right? And that's his claim. That's his claim. Okay. I take issue with... I mean, your comments raise several issues, but I take issue with the argument that he was forced to retire. Well, he claims that. We're not saying he was. That's my point. Yeah. And we were before the district court on summary judgment. Mr. Riley, at that point, has to come forward with facts to support that claim. No, you weren't before the district. Well, I don't know about the summary judgment. The district court ruled on qualified immunity. Didn't rule on whether he could prove those facts, right? That never would happen. At least the district court made a determination that there were facts in dispute about whether or not he was forced to retire. And my point is, that's what the district court decided. My point is that that determination was erroneous because the record shows there were no such facts in dispute for the reasons that I've argued, and in the question that you proffered to Mr. Corrado, that there aren't any. The suggestion that Snowmaker disliked Riley, that does not ipso facto mean that there is a fact from which an inference can be drawn that, one, he retaliated against him because of the Munoz matter, which, by the way, was 10 years earlier. Snowmaker's recommendation was 10 days after Flowers' report. And two, that he would not have made the same decision anyway. I mean, remember, the Atlantic City Police Department was chastised by Judge Irina Sinharo for ignoring sexual harassment. Let me ask, if I might, I know we're on the red line. Yeah, we are, and there's another case coming. People have been very patient. Let me ask this. Here's what I just heard your opposing counsel say. There is a record of discipline that's recommended by the hearing officer, and what was done was substantially beyond that. There's a record of an expert report saying what a proportionate disciplinary response would have been, and this was substantially out of line with that. There is a record of Mr. Riley's own disciplinary history, which shows something about what discipline has been affected in the past. And there's a record that shows that Mr. Snowmaker didn't like Mr. Riley, told people he didn't like Mr. Riley. The history in the department indicates he didn't like Mr. Riley, and that he had a relationship with Mr. Flipping, in which it was in his, Mr. Snowmaker's interest to keep Mr. Flipping happy, and Mr. Flipping really didn't like Mr. Riley. Now, when I hear all that, I struggle with the assertion that there's no evidence in the record from which one could infer that Mr. Snowmaker had any interest here in doing anything but his own job, and that this would have happened anyway. So, that's what I'm wrestling with, Mr. Russell. When you say there's no evidence, I'm hearing the other side say, hey, look at this evidence. Why should we? I mean, you don't dispute that those things are in the record, I take it. You're just telling us that that really doesn't have anything to do with Mr. Snowmaker's motivation whatsoever. It doesn't, and I'll be as brief as I can. Here's why. The defendants don't have to like Mr. Riley. We know that from all kinds of employment cases. They don't have to. Everything that's in the record, Judge Jordan, that you just pointed out shows one thing for sure. I got a hat in the Lakewood Federal Plaintiff that the defendants don't like him, but what the record doesn't show and what Mr. Riley had to do before the district court on our motion will show that the defendants were motivated by his involvement in the Munoz case to the extent that, again, we get past Garcetti, but that's when it becomes actionable. You can retaliate against an employee for good reason, bad reason, or no reason at all, as long as it's not for protected conduct. The claim is here that the protected conduct was his involvement in Munoz. However, the record shows that there were no facts that in any way, shape, or form that the defendants, and specifically Snowmaker, were in any way, shape, or form motivated by the protected conduct. That's what this case is about, and protected conduct is Munoz. Thank you very much. We'll take it under advisement. We'll hear the lawyers in the Walke case. They've been very patient. I hope you learned a lot of law while you were sitting there.